WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marie A Mdamu,<br><br>        Plaintiff,<br><br>v.<br><br>American Traffic Solutions Incorporated,<br><br>        Defendant. | No. CV-15-00326-PHX-DLR<br><br>**ORDER** |

Defendant has filed a motion for summary judgment. (Doc. 34.) The Court held oral argument on the motion on June 21, 2016, and at the conclusion of the hearing, took the matter under advisement. For the reasons stated below, the motion is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiff Marie Mdamu worked for Defendant American Traffic Solutions Incorporated (ATS) as a Violations Processor from January 2008 to August 29, 2012. (Doc. 35, ¶ 3.) As a Violations Processor, Mdamu's job was to "view and process video footage of traffic events taken by ATS cameras, which information is provided to ATS' municipal clients for further review." (*Id.*, ¶ 7.) This requires entering data into computers and the ability to process a certain number of potential violations per hour (VPH). (*Id.*, ¶ 8.) The VPH metric is important because it ensures that ATS will meet its contractual obligations to its customers. (*Id.*, ¶ 9.) When Mdamu began working at ATS in 2008, the VPH

requirement was 70, meaning that Violations Processors were expected to review and process 70 potential violations per hour. (*Id.*, ¶ 11.) During Mdamu's employment, the VPH increased to 110. (*Id.*)

In addition, Violations Processors are subject to certain Attendance Guidelines, which assign point values to certain type of absences. (*Id.*, ¶¶ 12, 14.) The type of disciplinary action depends on the number of points accrued on a rolling 12-month basis. (*Id.*, ¶¶ 15, 16.) For example, if a Violations Processor misses half of a workday or a full workday, she accrues 1 point. (*Id.*, ¶ 14.) If she fails to show up for work without notice, she accrues 3 points. (*Id.*) If a Violations Processor accrues 5 points, she receives a documented verbal warning. (*Id.*, ¶ 15.) If she accrues 9 points during the 12-month period, her employment is terminated. (*Id.*)

In 2010, Mdamu developed "some cramping in her right wrist and hand" and was "diagnosed with Quervian tenosynovitis" by her physician, Dr. Kraig Burgess. (Doc. 42, ¶¶ 4-5.) In 2011, ATS increased the VPH requirement to 110. (*Id.*, ¶ 6.) Mdamu asserts the increase "was causing [her] substantial pain and dramatically affecting her ability to meet the new goal." (*Id.*) ATS maintains the increase was made "to reflect the productivity of Violations Processors" and that all Violations processors were subject to the increased workload. (Doc. 35, ¶ 11.) Mdamu struggled to keep up with the 110 VPH requirement. (*Id.*, ¶ 31.) In January 2012, Mdamu received a verbal warning for failing to meet the 110 VPH requirement because she had missed it by 20-30 events per hour in each of the previous three months. (*Id.*, ¶ 32.) Mdamu was warned that she needed to come within 95% of the 110 VPH requirement by the end of the thirty-day period. (*Id.*)

On March 13, 2012, Mdamu received another verbal warning because she failed to meet the 110 VPH requirement. (*Id.*, ¶ 33.) That same day, Mdamu's chiropractor, Dr. David Campbell, prepared a heath care provider certification in connection with Mdamu's complaints of neck, back, and wrist pain. (*Id.*, ¶ 34.) Dr. Campbell described Mdamu's condition as temporary and advised that she be able to "rest more often" and use a "standing workstation w/ bar stool to sit [at]." (*Id.*, ¶ 35.) A week later, Dr.

Burgess submitted a second health care provider certification indicating that Mdamu suffered from temporary "right deQuervains tendonitis." (*Id.*, ¶ 36.) He prescribed Naproxen and recommended that Mdamu be limited to a VPH of 70. (*Id.*) In response, ATS provided Mdamu a standing workstation, bar stool, and an ergonomic keyboard, mouse, and wrist pad. (*Id.*, ¶ 37.) ATS sought further clarification from Dr. Burgess regarding how many breaks Mdamu required. (*Id.*, ¶ 42.)

Mdamu's average VPH for March 2012 was 89.66. (*Id.*, ¶ 39.) She claims the Naproxen helped her process faster, but also made her drowsy, which interfered with her production. (Doc. 42, ¶ 15.) On April 6, 2012, she received a written warning and her supervisor, Scott Darnell, arranged for another Violations Processor to observe Mdamu's work practices and help her attain the 110 VPH. (Doc. 35, ¶ 41.) The observer noted that "Mdamu engaged in unnecessary tasks, such as watching videos from beginning to end when traffic events appeared at the beginning of the footage and cropping photos before confirming a traffic event had occurred." (*Id.*) The observer also noted that Mdamu also struggled with her mouse and keyboard. (Doc. 35-2 at 34.)

On April 19, 2012, ATS posted an internal job opening for several Safety Processing Training Subject Matter Experts (SMEs), "who would perform their duties as Violations Processors, but also coach and train new hires for up to six months." (Doc. 35, ¶ 49.) The post noted that it was available only to ATS employees "not currently on written or final disciplinary action." (*Id.*, ¶ 50.) Mdamu applied, but did not meet the requirements because she was on written disciplinary warning. (*Id.*, ¶ 51.)

On May 3, 2012, Mdamu filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (*Id.*, ¶ 53.) She alleged ATS denied her requests for reasonable accommodation and transfer to a new position. (Doc. 35-2 at 95.) She also alleged she was "subjected to write-ups and placed on a Performance Improvement Plan" because of her disability. (*Id.*)

On May 22, 2012, Mdamu received a written warning after she accumulated 7 attendance points. (Doc. 35, ¶ 18.) The warning stated that Mdamu would be "subjected

to further action (up to and including termination) at any time during or after the performance notice period" if she failed to immediately improve her performance and attendance. (*Id.*, ¶ 19.) In addition, Mdamu was precluded from applying to other open positions at ATS until the warning period expired. (*Id.*, ¶ 18.) Although the warning was subject to expire on June 22, 2012, it was extended until January 20, 2013 because Mdamu was late to work on May 30, 2012 and June 11, 2012. (*Id.*, ¶ 20.)

On May 31, 2012, Dr. Burgess responded to ATS' request for clarification regarding Mdamu's breaks. (*Id.*, ¶ 42.) He recommended that Mdamu's VPH be reduced to 70 and that she be able to work a reduced schedule of four hours per day, five days per week, for six months. (*Id.*) As a result, effective June 4, 2012, ATS placed Mdamu on the recommended reduced schedule and permitted Mdamu to take a 5-10 minute break each hour, which was not counted against her VPH requirement. (*Id.*, ¶ 43.) ATS did not, however, reduce the VPH requirement to 70. (*Id.*, ¶ 45.)

Mdamu missed full days of work without providing notice on July 27 and August 1. (*Id.*, ¶ 23.) In the middle of August, Mdamu left work three hours early and was given a final written warning. (*Id.*, ¶ 21.) When asked about missing work on July 27 and August 1, Mdamu told ATS that her absence was due to a health issue. (*Id.*, ¶¶ 24-25.) But Dr. Burgess never responded to ATS' request for medical certification, and thus ATS assessed points to Mdamu's unexcused absences, bringing her twelve month total to 10 points, which resulted in termination of her employment. (*Id.*, ¶¶ 26-27.)

Mdamu's last day at ATS was August 29, 2012. (*Id.*, ¶ 29.) On August 30, 2012, Mdamu filed another EEOC charge, alleging that she was "given multiple write-ups" and fired after requesting reasonable accommodation. (Doc. 35-2 at 97.) The EEOC dismissed both charges and issued a right to sue notice. (*Id.* at 104-08.)

Mdamu brought suit on February 23, 2015, and filed an amended complaint on October 30, 2015, alleging claims of disability discrimination and retaliation under the Americans with Disabilities Act (ADA). (Docs. 1, 25.) ATS now moves for summary judgment on both claims. (Doc. 34.)

## LEGAL STANDARD

Summary judgment is appropriate when, viewing the facts in a light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to establish the existence of a material fact. *Id*. at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

Mdamu argues ATS (1) failed to accommodate her disability by refusing to reduce the VPH requirement, which resulted in her termination, and (2) denied her the SME job and later fired her in retaliation for filing the May 2012 EEOC charge and requesting reasonable accommodation. (Doc. 25, ¶¶ 32-49.)[1]

---

[1] To the extent that Mdamu complains of a hostile work environment, the Court finds that claim meritless. Mdamu did not make any such allegations in her EEOC charges, and thus she has failed to exhaust this claim. *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990). In addition, the Ninth Circuit has not recognized that such a claim is cognizable. *See EEOC v. Evergreen Alliance Golf Ltd.*, No. CV11-0662-PHX-JAT, 2013 WL 4478870, at *9 (D. Ariz. Aug. 20, 2013). Even if it were, the record undermines Mdamu's allegations. Mdamu testified that her supervisor, Darnell, paid extra attention to her work, reminded her to meet the 110 VPH requirement, told her to stop making excuses for her failure to meet the VPH requirement, and that his tone of

**I. Unlawful Termination**

To establish a prima face case of unlawful termination under the ADA, Mdamu must demonstrate that "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). If the plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its conduct. *See Fleming v. IASIS Healthcare Corp.*, --- F. Supp. 3d ---, No. CV-14-02333-PHX-NVW, 2015 WL 9302301, at *6 (D. Ariz. Dec. 22, 2015). If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretext for discrimination. *Id.*

For purposes of its motion, ATS does not dispute that Mdamu is disabled within the meaning of the ADA or that she suffered an adverse employment action. (Doc. 49 at 1). Instead, ATS argues that Mdamu is not a "qualified individual with a disability" because she was unable to perform two essential functions of her job with or without reasonable accommodation: (1) meeting the 110 VPH requirement, and (2) complying with the Attendance Guidelines. ATS asserts these two functions are essential to working as a Violations Processor, and thus it need not accommodate Mdamu by modifying, reducing, or eliminating these functions.

A qualified individual under the ADA is a person "with a disability who satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such person holds or desires," 29 C.F.R. § 1630.2(m), and "who, with or without reasonable accommodation, can perform the essential functions of the

---

voice had extra "bass." (Doc. 35-1 at 53-54.) But Mdamu admitted that Darnell never yelled at her, cursed at her, mentioned her disability, or teased her. (Doc. 42, ¶ 58.) In fact, after her first warning for missing the VPH, Mdamu reported that Darnell was "professional and understanding" with regard to her disability. (*Id.*, ¶ 59.) Mdamu fails to connect any alleged harassment to her disability. As such, Mdamu fails to establish that she worked in an environment permeated with abuse related to her disability. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

1 employment position that such individual holds or desires," 42 U.S.C. § 12111(8).
2 Essential functions are the "fundamental job duties" of the position. 29 C.F.R. §
3 1620.2(n). The employer "has the burden of production in establishing what job
4 functions are essential as 'much of the information which determines those essential
5 functions lies uniquely with the employer.'" *Samper*, 675 F.3d at 1237 (quoting *Bates v.*
6 *United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc)). In making this
7 determination, courts should consider (1) the employer's judgment regarding what
8 functions are essential, (2) job descriptions prepared before advertising or interviewing
9 applicants, (3) the amount of time spent on the job performing the function, (4) the
10 consequences of not requiring the employee to perform the function, and (5) the work
11 experience of current and former employees. *See Bates*, 5114 F.3d at 991 (citing 29
12 C.F.R. § 1630.2(n)(3)(i)-(vii)).

13 Importantly, an essential function of a job need not be eliminated, modified, or
14 reassigned in order to reasonably accommodate a disabled employee. *See Cripe v. City of*
15 *San Jose*, 261 F.3d 877, 889 (9th Cir. 2001) ("Reasonable accommodations are
16 mechanisms to remove barriers or provide assistance to disabled individuals so that they
17 can perform the 'essential functions' of employment positions."). "Employers are only
18 required to make 'reasonable accommodations' that do not impose 'undue hardships' on
19 them." *Id.* at 885 n.6 (quoting 42 U.S.C. § 12112(b)(5)(A)).

20 **A. VPH Requirement**

21 ATS argues the 110 VPH requirement is an essential function of Violations
22 Processors and that Mdamu continually failed to perform this function. It asserts all
23 Violations Processors were held to the same standard. In contrast, Mdamu argues that the
24 110 VPH requirement was not established until the third quarter of 2012 and that other
25 Violations Processors received a reduced VPH requirement due to their disability. (Doc.
26 41 at 11.) She asserts that the "VPH production requirement was not essential; rather, the
27 accuracy was the essential function." (*Id.* at 12.)

28 Debbie Duff, ATS' Director of Service Delivery, testified that the VPH

1   requirement is an essential function of a Violations Processor.  (Doc. 35-1 at 94.)  She
2   stated that ATS set the goal to meet customer expectations and to meet service levels that
3   are contractually agreed upon with ATS' customers.  (*Id.* at 96.)  In addition, if an
4   employee were to be permitted a reduction in their VPH requirement, another employee
5   would have to make up the reduction, which would "cause a lot of questions as to why
6   someone's allowed a lesser amount and still be[ing] employed." (*Id.* at 103.)  Duff also
7   stated that permitting a reduction would impact ATS financially because it would have to
8   pay employees overtime or hire additional employees to make up the difference.  (*Id.*)
9   She further noted that the VPH was increased to 110 in the third quarter of 2011, and that
10  employees were expected to achieve at least 90% of the 110 VPH.  (Doc 49 at 23.)[2]

11  Karen Holihan*,* ATS' Human Resources Business Partner Manager, testified that
12  reducing Mdamu's quota would impact ATS' ability to "anticipate how much work
13  comes through our operations department on a given day," which affects schedules, and
14  ultimately, ATS' profitability.  (Doc. 35-2 at 24.)  She clarified that if an employee
15  cannot perform an essential function of her job, it would cause an undue hardship to ATS
16  financially.  (Doc. 43-10 at 7.)  Holihan detailed the accommodations provided to
17  Mdamu, which included a standing workstation, ergonomic keyboard, trackball mouse,
18  raised stool, and reduced working hours.  (Doc. 35-2 at 26.)  At one point, ATS also
19  offered to change Mdamu's schedule from four ten-hour days to five eight-hour days, but
20  Mdamu refused because of daycare issues.  (Doc. 43-10 at 10.)  Holihan stated that ATS
21  never permitted reduced VPH as an accommodation for any employee who requested it.
22  (Doc. 35-2 at 24.)

23  Mdamu testified that two employees, Huskie and James, received "help" after they
24  had surgery, but she could not remember whether their VPH was reduced.  (Doc. 49 at
25  32-33.)  She stated that she knew of no employee who was permitted to reduce their VPH

---

[2] At her deposition, Duff misspoke and said the VPH was changed in 2012.  She then changed her answer to 2011.

requirement. (*Id.* at 34.)[3] She also testified that when she started working for ATS, the VPH was 70, but less than six months later it increased, though she could not remember how much. (Doc. 35-1 at 17.) Mdamu learned of the 110 VPH at a meeting in which all Violations Processors attended, and she knew that it was applicable to all Violations Processors. (*Id.* at 17-18.)

After considering the factors set forth in 29 C.F.R. § 1630.2(n) and the evidence submitted by the parties, the Court finds that the 110 VPH requirement is an essential function of a Violations Processor. The undisputed evidence indicates that (1) ATS, as part of its business judgment, considered the VPH requirement essential to maintain productivity; (2) all Violations Processors were required to meet the requirement; and (3) ATS' productivity would diminish if Mdamu and other employees were exempted from the requirement. Although Mdamu disagreed with the 110 VPH, it is undisputed that she understood she was required to meet ATS' expectations. Further, Mdamu was not the only employee who was required to be highly productive—all employees had to meet the requirement—and Mdamu has not identified any other employees who were allowed a VPH reduction.[4]

The facts of this case are similar to *Beaver v. Delta Air Lines, Inc.*, 43 F. Supp. 2d 685, 694 (N.D. Tex. 1999). In *Beaver*, the plaintiff was employed as a "Reservations Sales Agent" for Delta and was responsible for "generating revenue for Delta by selling the company's services to customers." *Id.* at 687 n.1. Her job responsibilities included "taking calls from customers, locating flight information in the computer, reading

---

[3] James testified that, in order to accommodate her disability, ATS was "willing to modify my [VPH] requirement[.]" (Doc. 43-5, ¶ 24.) But James does not provide the name of any ATS employee who made such an offer, how much of a reduction she would receive, or when she made the request. In any event, the reduction never occurred because James left ATS.

[4] Mdamu argues that job postings for Violations Processors did not identify a specific VPH requirement. Although neither of the two job postings referred to by the parties contain a specific VPH requirement, (Doc. 35-1 at 89, 91), job listings are not dispositive on this issue, and ATS requires different VPH requirements for different types of processors, (Doc. 42, ¶ 86). In any event, Mdamu does not dispute that the position involves high volume data entry.

- 9 -

1 information from the computer screen and hard copy materials, conveying that
2 information to callers and entering reservation information." *Id.* During her
3 employment, the plaintiff suffered a head injury, which resulted in permanent, partial
4 vision loss in both eyes. *Id.* Upon returning to work, the plaintiff was "continuously
5 counseled for her poor productivity," including her "lack of salesmanship and poor
6 attendance." *Id.* The plaintiff stated that her "blind spots required her to read more
7 slowly, thereby affecting her productivity," and requested "that she be excused from
8 Delta's productivity requirements" and be permitted extra breaks. *Id.* at 687-88. Delta
9 "took away some of [the plaintiff's] job responsibilities, such as answering information
10 calls from Spanish speaking customers, to allow her to concentrate on general sales
11 calls." *Id.* at 688. But her productivity did not increase, and she was eventually
12 transferred to another position. *Id.* at 689. The court concluded that Delta's production
13 requirements, such as processing a high volume of sales calls, were essential functions of
14 the plaintiff's job. *Id.* at 694. It noted that the plaintiff's job "is particularly important to
15 the efficient running of Delta's business," and that satisfying and maintaining
16 productivity and performance standards is "essential to increasing Delta's sales revenue."
17 *Id.* Therefore, because she could not perform an essential function of her job, the
18 plaintiff was not a qualified individual under the ADA. *Id.*

19 Like the plaintiff in *Beaver*, Mdamu's job involved high-volume production,
20 which is particularly important to ATS' business. In fact, Mdamu's entire job centers on
21 efficiently processing violations, and ATS set the 110 VPH requirement in order to meet
22 customer needs and satisfy existing contractual obligations. The 110 VPH is not an
23 arbitrary number ATS implemented to target Mdamu—it is based on legitimate
24 productivity goals. As with Delta in *Beaver*, processing violations at a high volume is
25 essential to ATS' ability to maintain and increase revenue.

26 In sum, the Court's role is "not to second guess the business decisions of a
27 company and inquire as to whether the goals set by management demand 'too much'
28 from its employees." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1091 (7th Cir. 2000).

Mdamu's (and other former employees') subjective belief that the VPH requirement was too difficult to meet is irrelevant. The undisputed evidence indicates that ATS went above and beyond its obligations under the ADA to accommodate Mdamu's disability by permitting her to work substantially reduced hours, providing her expensive equipment to help her do her job, and thoroughly investigating Mdamu's complaints. The evidence also indicates that the VPH requirement is essential to the job of a Violations Processor, and thus ATS need not reduce, modify, or eliminate that function in order to accommodate Mdamu. Because Mdamu does not dispute that she cannot perform an essential function of her job, she is not a qualified individual under the ADA, and her claim fails.

**B. Attendance**

Assuming *arguendo* that the VPH requirement is not an essential function of a Violations Processor, Mdamu's claim still fails because it is undisputed that attendance *is* an essential function of a Violations Processor. "It is a 'rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual.'" *Samper*, 675 F.3d 1237 (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999)); *see also Ford Motor*, 782 F.3d at 762-63 ("Regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs[.]"). "[A]n employee who does not come to work cannot perform any of [her] job functions, essential or otherwise." *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc) (internal quotation marks omitted). "Attendance may be necessary for a variety of reasons," including a requirement that the employee "work with items and equipment that are on site." *Samper*, 675 F.3d at 1237-38.

Mdamu does not dispute that attendance is an essential function of her job.[5] ATS requires its employees to abide by its Attendance Guidelines, which assess points based on the type of absence. (Doc. 35-1 at 122-131.) At her deposition, Mdamu testified that

---

[5] In her response brief, Mdamu did not address ATS' contention that attendance is an essential function of a Violations Processor, nor did she dispute that she failed to comply with the Attendance Guidelines. (*See* Doc. 41.)

- 11 -

she received a copy of the Attendance Guidelines, acknowledged them via signature, and understood that regular attendance was a requirement of Violations Processors. (*Id.* at 20-21.) Mdamu stated that she understood the point system and did not dispute that she accumulated numerous points during her employment, including 10 in 2012, which led to her termination. (*Id.* at 24-25.) She further testified that she knew of no employee that had accumulated at least 9 attendance points but was not terminated under the Attendance Guidelines. (*Id.* at 25.) ATS considers attendance an essential function of its employees, and the consequences of not requiring attendance are obvious. *See Bates*, 5114 F.3d at 991 (citing 29 C.F.R. § 1630.2(n)(3)(i)-(vii)). If an employee continually misses work or leaves early, ATS loses productivity and cannot efficiently run its business. ATS need not lower its standards to accommodate an employee who does not show up to work. Indeed, the ADA "does not endow all disabled persons with a job—or job schedule—of their choosing." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 757 (6th Cir. 2015).

Mdamu argues that her disability precluded her from meeting the attendance function of her position. (Doc. 41 at 7.) She claims that she disputed her attendance issues because of her medical condition at least once. (*Id.*) She also asserts that her disability caused her to miss work because of physical therapy and that she attempted to make up some of her absences. (*Id.*) But ATS was not required to give Mdamu "a free pass for every unplanned absence" allegedly caused by her disability. *Samper*, 675 F.3d at 1240. Mdamu does not dispute that in a relatively short period, she failed to show up for work without notice at least twice, she was late to work twice, left three hours early once, and failed to provide medical documentation in support of the absences. Even now, Mdamu provides no evidence that her absences were, in fact, caused by her disability. Because attendance is an essential function of a Violations Processor, and because it is undisputed that Mdamu failed to perform that essential function with or without accommodation, a reasonable jury could not find that she is a qualified person with a disability under the ADA. Her claim fails.[6]

---

[6] Mdamu also struggled with attendance in 2008 and 2009. (Doc. 35-1 at 133-35.)

## II. Retaliation

The aforementioned finding that Mdamu is not a qualified individual is relevant to her retaliation claim. The ADA prohibits employers from retaliating against an employee for having opposed "any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). Mdamu argues ATS retaliated against her by refusing to reduce the VPH requirement, denying her promotion to the SME position, micromanaging her work, and terminating her employment. She asserts these actions were taken because she requested accommodation for her disability and ultimately filed a charge with the EEOC.

To establish a prima face case of retaliation, the plaintiff must establish "that [s]he engaged in an activity protected by the statute, that [s]he suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse action." *See Garber v. Embry-Riddle Aeronautical Univ.*, 259 F. Supp. 2d 979, 983 (D. Ariz. 2003). Like Mdamu's unlawful termination claim, if ATS proffers a legitimate, nondiscriminatory reason for its conduct, Mdamu must present evidence of pretext. *See Fleming*, 2015 WL 9302301, at *6.

Even assuming Mdamu can make out a prima facie case of retaliation, ATS has proffered a legitimate, nondiscriminatory reason for its conduct—Mdamu's violation of the Attendance Guidelines. The burden thus shifts to Mdamu to present evidence of pretext. To meet her burden, Mdamu must present evidence "from which a reasonable jury could find that poor performance was not the real reason" for ATS' conduct, "and that unlawful retaliation in fact was." *Ford Motor*, 782 F.3d at 767; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993).

Mdamu fails to rebut ATS' legitimate, nondiscriminatory reason.[7] In fact, Mdamu admits that "ATS discharged [her] solely due to her repeated violation of [the Attendance Guidelines]." (Doc. 42, ¶ 31.) She also admits that Dr. Burgess never responded to

---

On September 15, 2009, her supervisor noted that "Marie was out 6 days and [t]ardy a total of 13 days since June of 2008[.]" (*Id.* at 135.)

[7] ATS' legitimate reason also defeats Mdamu's unlawful termination claim.

- 13 -

ATS' request for medical certification, (*Id.*, ¶ 26), nor does she argue that ATS should not have assessed her points for her absences. With respect to the denial of her application for the SME position, she admits that she was on disciplinary warning at the time of her application, which undisputedly rendered her ineligible for promotion. (*Id.*, ¶ 51.) Moreover, given the fact that she was continually failing to comply with the VPH requirement and Attendance Guidelines, it seems highly unlikely that a promotion would have been in line for Mdamu at the time.[8]

Nonetheless, as evidence of pretext, she argues that after she filed the EEOC charge, she was targeted for her poor performance. (Doc. 41 at 16.) She also claims that other processors who failed to the meet the VPH were targeted and that "there was speculation that supervisors were fudging the attendance numbers of processors who were not meeting the 110 VPH, such as Marie, to terminate them[.]" (*Id.* at 17.)

In support of these claims, she cites the declarations of three former coworkers, Deena Burden, Joanne Huskie, and Yvonne James. Burden states, "[f]rom what I understood, employees that were not meeting their expected requirement and those considered 'low performing' employee were let go." (Doc. 43-3, ¶ 5.) She stated that Darnell "micromanaged" employees and that it "felt like a master/slave type relationship." (*Id.*, ¶ 6.) Burden claims she saw Darnell "target [Mdamu] for her inability to meet the VPH requirement" and that he was "very rude and unprofessional to her and treated her like a child." (*Id.*, ¶ 7.) She further stated that she had attendance issues herself due to Darnell's treatment. (*Id.*, ¶ 9-11.)

Huskie also testified that Darnell was rude to Mdamu and targeted her performance. (Doc. 43-6, ¶¶ 9-11.) She also states that she was "aware that some people in management were targeting processors who were not meeting the goal and fudging their numbers in an effort to terminate the employees who were not performing." (*Id.*, ¶

---

[8] Mdamu claims she applied for three jobs. (Doc. 41 at 13.) But she provides no evidence regarding when she applied for the jobs and what functions they entailed. The Court cannot determine whether she should have been transferred to these jobs due to her disability.

- 14 -

15.)  She stated, however, that she did not know whether Darnell was involved.  (*Id.*, ¶ 16.)

James stated that Darnell "nit-pick[ed]" Mdamu on a daily basis.  (Doc. 43-5, ¶ 7.) She stated that Darnell was unprofessional and would "dock [Mdamu's] time" for helping James with her seizures.  (*Id.*, ¶ 12.)  She further states that it is her "opinion that Mr. Darnell increased his micro-management over [Mdamu] after the EEOC claim was filed." (*Id.*, ¶ 14.)  James claims she was not fired, but eventually had to leave ATS because of her disability.  (*Id.*, ¶¶ 22-23.)

None of this evidence creates a question of fact regarding whether ATS retaliated against Mdamu for engaging in any protected activity.  In fact, none of it even remotely connects Mdamu's disability to ATS' conduct.  The former employees' subjective beliefs about how Mdamu was treated are irrelevant.  Not one of them states that Darnell ever mentioned Mdamu's disability during his "micromanaging."  Nor do they describe a history of discrimination against employees with disabilities.  At most, the evidence suggests ATS' management team was attempting to weed out poor performing processors.  But the ADA does not protect poor performing employees—it protects individuals discriminated against because of their disability.  The fact that Mdamu may have been targeted for her poor performance does not implicate any discriminatory motive simply because she has a disability.  Without any other evidence of discriminatory motive, Mdamu is left with only her subjective belief that she was retaliated against for filing the EEOC charge or requesting reasonable accommodation, which falls far short of establishing pretext.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) ("A plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action.  Nor may a plaintiff create a genuine issue of material fact by relying on the plaintiff's subjective beliefs that the challenged employment action was unnecessary or unwarranted.").

In sum, Mdamu fails to provide any evidence that ATS retaliated against her

because of her disability as opposed to her poor productivity and poor attendance. As such, a reasonable jury could not find that ATS' proffered reason is pretext for discrimination or retaliation due to Mdamu's disability.

**III. Conclusion**

The undisputed facts demonstrate that Mdamu is not a qualified individual with a disability under the ADA because she cannot perform two essential functions of her job. In addition, even if she could establish that she is a qualified individual, Mdamu fails to rebut ATS' legitimate, nondiscriminatory reason for its conduct. Summary judgment is granted in favor of ATS on both of Mdamu's claims.

**IT IS ORDERED** that Defendant's motion for summary judgment, (Doc. 34), is **GRANTED**. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 24th day of June, 2016.

Douglas L. Rayes
United States District Judge